FILED
APR 1 4 2021
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **4:21CR00255 SEP/NCC** |
| v. ) | |
| ) | |
| AMY E. SWEGAN, M.D., ) | |
| ) | |
| ) | |
| Defendant. ) | |

### INDICTMENT

The Grand Jury charges:

### BACKGROUND

#### Defendants

1.      Since in or about 1999, Defendant Amy E. Swegan has been a licensed medical doctor with a specialty in general surgery. At all relevant times, the Defendant was licensed in Ohio and Pennsylvania, but also caused reimbursement claims to be submitted for telemedicine services purportedly provided to patients in other states.

2.      At all times relevant to this indictment, the Defendant was employed by or contracted with companies that provided health care related services and submitted reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for services she purportedly provided.

#### Relevant Medicare Provisions

3.      The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. There are four parts to

Medicare, each part providing coverage for different health care services: Part A (hospital and inpatient services); Part B (outpatient services); Medicare Part C (Medicare Advantage Plans); and Part D (prescription drugs).

4. Medicare Part B reimburses health care providers for covered health services provided to Medicare beneficiaries in outpatient settings. The covered services include, but are not limited to, durable medical equipment ("DME") and diagnostic tests that have been determined to be medically necessary and ordered by a medical doctor, nurse practitioner, physician assistant, or other Medicare authorized provider (referred to collectively as "doctor" or "physician."). As to diagnostic tests, Medicare Part B reimburses for diagnostic tests only if, among other requirements, the tests were ordered by a physician treating the beneficiary, that is, the physician furnished a consultation or treated a beneficiary for a specific medical problem and used the results of the tests in the management of the beneficiary's specific medical problem.

5. The Medicare Advantage Program, known as Medicare Part C, offers beneficiaries a managed care option by allowing individuals to enroll in private health plans rather than having their care covered through Medicare Part A or Part B. CMS contracts with Medicare Advantage programs to provide medically necessary health services to beneficiaries; in return, CMS makes monthly payments to the Medicare Advantage programs for enrolled beneficiaries.

6. Medicare Part D is administered through private companies, called plan sponsors, which offer retail prescription drug coverage to Medicare beneficiaries. The plan sponsors contracts with pharmacies, which fill prescriptions and dispense the prescription drugs to

Medicare beneficiaries. The pharmacies submit reimbursement claims to the plan sponsors for the medications dispensed to Medicare patients.

7. CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service.

8. To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

9. Medicare providers must retain clinical records for the period required by state law or five years from the date of discharge if there is no requirement in state law.

**Defendant's Enrollment in Medicare**

10. On or about October 9, 2006 and again on or about April 14, 2010, the Defendant completed Medicare provider enrollment applications and certified therein:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information ... contained in any communication supplying information to Medicare ... [may be criminally prosecuted] ...
>
> I agree to abide by the Medicare laws, regulations and program instructions including the **Federal anti-kickback statute**

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

11.     On or about November 2, 2011 and on or about October 14, 2014, the Defendant signed Medicare reassignment of benefit forms, which advised her that "Providers and suppliers enrolled in Medicare are required to ensure strict compliance with Medicare regulations, including payment policy and coverage guidelines."

### Relevant Medicaid Provisions

12.     The Medicaid Program is jointly funded by the states and the federal government. The Medicaid Program reimburses health care providers for covered services rendered to eligible low-income Medicaid recipients. At times relevant to this indictment, the Defendant was an enrolled Medicaid provider in Ohio.

### Relevant Tricare Provisions

13.     Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries. DHA exercises management responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

### Federal Anti-Kickback Statute

14.     Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

15. The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay, or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

16. Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care services.

**Count 1**
**Conspiracy**
**18 U.S.C. § 371**

17. Paragraphs 1 to 16 are incorporated by reference as if fully set out herein.

18. Beginning in or about 2017 and continuing to in or about 2019, in the Eastern District of Missouri and elsewhere,

**AMY E. SWEGAN, M.D.,**

the defendant herein, and persons known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly combine, conspire, and agree with persons known and unknown to the grand jury to commit the following offenses against the United States:

    a. to defraud a health care benefit program and to obtain, by false and fraudulent representations, money owned by and under the control of a health care

  benefit program, in connection with the delivery and payment of health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347(a)(2);

b. to create and use false and fraudulent documents, including patient assessment and evaluation records and reimbursement claims for health care items and services, in violation of Title 18, United States Code, Section 1035(a)(2); and

c. to knowingly and willfully solicit, offer, pay, and receive kickbacks, bribes, and rebates for referrals for services to be reimbursed in whole or part by a federal health care benefit program, in violation of Title 42, United States Code, Section 1320a-7b(b).

### Purpose of the Conspiracy

19. The purpose of the conspiracy was for:

   a. doctors and others to receive illegal kickbacks in return for ordering and providing medically unnecessary durable medical equipment, genetic tests, and pain creams (collectively referred to as "Health Care Services") for patients with whom they did not have a doctor-patient relationship and did not determine the medical need for the Health Care Services; and

   b. the Defendant and her co-conspirators to enrich themselves by causing health insurers to reimburse for medically unnecessary Health Care Services.

**Manner and Means of the Conspiracy**

20. It was part of the conspiracy that marketing companies ran television and online ads offering orthotic braces and other services, at no cost, to patients. When a patient responded to the ad, an employee of a call center collected pertinent information from the patient, including the patient's name and address, the name of the patient's primary care physician, insurance information, Medicare number, and areas of pain. In some instances, the marketers made "cold calls" to patients.

21. It was further part of the conspiracy that the marketing companies and telemedicine companies sent the patient information to telemedicine doctors, who signed orders and certified that the patients needed the Health Care Services. In almost all instances, the telemedicine doctors had no prior doctor-patient relationship with the patients, did not directly communicate with the patients, and did not evaluate or assess the patients' medical need for the Health Care Services. The marketing or telemedicine companies sent the orders signed by telemedicine doctors to clinical testing labs, pharmacies, and DME companies.

22. It was further part of the conspiracy that DME companies, including MC Medical Supply and Integrity Medical Supply located in Cape Girardeau, Missouri, paid illegal kickbacks for DME orders referred or sent to them. At times relevant to this indictment, MC Medical Supply, owned by co-conspirator Brandy McKay, and Integrity Medical Supply, owned by co-conspirators Jackson Siples and "silent partner" Jamie McCoy, paid R&L Marketing, owned by R.F., as much as $250 for each order referred to them.

23. It was further part of the conspiracy that MC Medical Supply and Integrity Medical Supply submitted reimbursement claims to Medicare and other health care benefit plans

7

for the orders, including hundreds signed by the Defendant.

24. It was further part of the conspiracy that from in or about 2017 to in or about 2019, the Defendant contracted and worked as a telemedicine provider for several telemedicine companies, including but not limited to MedSymphony, Locum Tenens/Encore Telemedicine and its client companies: JT America, Just Benefits, Dial4MD, Expansion Media, and Call MD Plus. Through the telemedicine companies, the Defendant ordered medically unnecessary services, including but not limited to orthotics, genetic testing, and pain creams, for thousands of patients. The Defendant's telemedicine work was in addition to her work as a surgeon at health care facilities in Ohio.

25. The above-listed telemedicine companies gave the Defendant access to electronic portals to review documents related to the patients assigned to her. The electronic documents contained the patient's demographic information, chief complaint, insurance number, and the durable medical equipment or other services the patient's insurance would cover.

26. The Defendant knew that the patients, for whom she signed orders, were identified through mass telemarketing and cold calls and often lived in states far distant from her residence or practice. The Defendant also knew the telemarketers and others, who purportedly did intake of the patients by phone or videoconference, were not medical professionals or qualified to determine the patients' medical need for Health Care Services. Some of the intake workers pressured patients to exaggerate the length of time and the level of pain they experienced.

27. The Defendant did not have a prior physician-patient relationship with the patients, did not know them, did not speak to them in most instances, and did not attempt in any

way to evaluate and determine the patients' actual medical needs. Nor did the Defendant provide any follow-up care to the patients after she ordered Health Care Services for them.

<u>Defendant's Fraudulent Orders for Orthotic Braces</u>

28.     Medicare, Medicaid, and other insurers will reimburse for durable medical equipment, including orthotic braces ("braces") for the back, shoulder, arms, knees, and ankles, but only if a doctor or other qualified health professional determines that the brace is medically necessary for the patient. The doctor or qualified health professional must diagnose the patient's condition and determine that a particular brace will help alleviate the patient's problems.

29.     It was further part of the conspiracy that the Defendant did not assess the needs of the patients for whom she ordered braces. Instead, the Defendant ordered the braces that the intake worker indicated insurance would cover, resulting in patients receiving braces they did not need or want. As examples, in or about January 2019, the Defendant ordered one back brace, one shoulder brace, two knee braces, and two compression sleeves for Patient B.C. and Patient E.A. Medicare paid Integrity Medical Supply $2,064.00 and $2,135.00 for the braces the Defendant ordered for B.C. and E.A., who did not want or need the braces.

30.     It was further part of the conspiracy that the Defendant signed orders for multiple orthotic braces for some patients, which resulted in the patients receiving multiple unwanted and medically unnecessary braces.  Several examples are reflected in the below.

| Patient | Date of Service | Braces Ordered | DME Company Billing For Order | Billed To |
|---|---|---|---|---|
| D.N. | 08-06-18 | 1 back 2 knee 2 suspension sleeves | Integrity Medical Supply | Medicare |
| D.N. | 08-28-18 | 2 wrist 2 ankle | Atlantic Coastal Medical Supplies | Medicare |

| Patient | Date of Service | Braces Ordered | DME Company Billing For Order | Billed To |
|---|---|---|---|---|
| D.B. | 12-04-18 | 1 back<br>2 knees<br>2 suspension sleeves | Integrity Medical Supply | Medicare |
| D.B. | 12-17-18 | 2 ankle<br>2 wrist | Paradise Medical Solutions | Medicare |
| D.C. | 12-20-18 | 1 wrist<br>1 shoulder<br>2 knee<br>2 suspension sleeves | Integrity Medical Supply | Medicare |
| D.C. | 2-22-19 | 2 ankle | Paradise Medical Solutions | Medicare |

31.  It was further part of the conspiracy that between 2017 and 2019, the Defendant fraudulently ordered one or more braces for about 5,150 patients. Medicare Part B paid at least $7,641,060 for the medically unnecessary braces.

Defendant's Fraudulent Orders for Knee Braces

32.  Medicare has specific requirements which must be met before Medicare will reimburse for knee braces. A physician or qualified health professional must document that a knee brace is reasonable and medically necessary to treat a patient who has had a recent injury to or a surgical procedure on the knees or an ambulatory patient has knee instability. To establish knee instability, the physician must perform and document the clinical examination of the knee, including the tests performed on the knee, and include an objective description of the joint laxity. Pain or a subjective description of joint instability is insufficient to establish medical necessity for a knee brace.

33.  It was further part of the conspiracy that the Defendant falsely and fraudulently stated the required tests had been performed before she ordered knee braces. The Defendant used a physician order form for knee braces that expressly stated: "Knee tests required to prescribe

10

any knee orthotic. [A] minimum of 2 tests is required for each knee with a brace prescribed." The Defendant knew the required tests had not been done when she certified on the physician order form that a "Pivot Shift Test" and a "Cabot's Maneuver" had been done.

34. It was further part of the conspiracy that the Defendant signed the following medical necessity statement when ordering knee braces although she knew the statement was false:

> I certify that the patient has the medical condition(s) listed and is being treated by me. All the information contained on this physician's order accurately reflects the patient's medical condition(s) and is medically necessary with reference to the standards of medical practice for this patient's condition(s). The medical records for this patient substantiate the prescribed treatment plan.

35. It was part of the conspiracy that the Defendant began ordering knee braces in July 2017 only after Encore Telemedicine offered her a $30 kickback for each knee brace order that she signed. From in or about July 2017 and continuing to in or about April 2019, the Defendant ordered knee braces for 2,682 patients and Medicare paid $2,349,489 for the knee braces based on the Defendant's fraudulent orders. Notably, the Defendant did not order knee braces prior to July 2017 when she began receiving illegal kickbacks or after April 2019 when she became aware of the federal criminal investigation.

Defendant's Fraudulent Orders for Genetic (CGx and PGx) Tests

36. Federal law and regulations provide that Medicare will not reimburse for diagnostic testing that is not reasonable and necessary for the diagnosis or treatment of a specific illness, symptoms, complaint, or injury. The Defendant knew she was required to determine medical necessity before ordering genetic tests for insured patients and that the patient's desire or request for genetic tests did not establish medical necessity.

37.  Cancer genomic ("CGx") tests use DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic ("PGx") testing is used to detect specific genetic variations in genes that impact the metabolism of certain medications and, thus, help determine the effectiveness of such medications if used by a particular patient.

38.  It was part of the conspiracy that the Defendant signed numerous CGx and PGx orders, which contained the following "Confirmation of Informed Consent and Medical Necessity" which she knew to be false and fraudulent:

> The tests ordered are medically necessary for the risk assessment, diagnosis or detection of a disease, illness, impairment, symptom, syndrome or disorder. The results will determine the patient's medical management and treatment decisions. The person listed as the Ordering Physician is legally authorized to order the test(s) herein. The patient was provided information about genetic testing and has consented to genetic testing.

39.  It was part of the conspiracy that on or about May 18, 2018, the Defendant signed the above-described CGx order form for B.A., an 82-year old patient, and caused the order to be transmitted to CLIOLAB. The Defendant had no contact with patient B.A. and did not determine that patient B.A. had a medical need for the CGx test.

40.  Signing CGx and PGx orders for patients without determining medical necessity was standard practice for the Defendant. As an example, in or about September 2018, the Defendant agreed to sign multiple CGx tests after receiving a September 14, 2018 email from Encore. The email asked the Defendant if she was interested in reviewing and signing "about 180 CGx/PGx files/patients that they have completed intakes and waiting to be processed. We just need them to be reviewed by a handful of doctors, Docu-signed and returned so we can send them *off* to the Lab." The Defendant responded the same day: "Yes I'm interested. Thanks."

41.     The Defendant knew it was highly unusual and suspicious to have so many genetic specimens <u>before</u> a doctor determined the medical necessity for the genetic tests. Nonetheless, the Defendant immediately agreed to sign CGx orders for patients with whom she had no relationship, had had no contact before the genetic tests were ordered, and would provide no follow-up after the tests were performed.

42.     It was part of the conspiracy that the Defendant signed the orders and caused the laboratories receiving her CGx and PGx orders to submit reimbursement claims to health care benefit programs. The laboratories billed $2,024,501 to Medicare Part B, which paid $701,661, an average of $6,049 for each of the 116 Medicare Part B patients for whom the Defendant ordered CGx tests.

<u>Defendant's Fraudulent Orders for Topical Creams</u>

43.     It was part of the conspiracy that the Defendant ordered medically unnecessary topical creams for patients, who did not request or need the creams and had never heard of the Defendant. Between August 2017 and August 2019, the Defendant caused Medicare Part D to pay $285,789 to pharmacies for topical creams that she ordered. Medicare Part D paid an average of $2,305 for the topical creams for each of the 124 patients for whom the Defendant ordered topical creams.

44.     The Medicaid Program in Ohio paid $289,624 for topical creams; most of the prescriptions for the creams were filled by Pharmhouse Pharmacy, located in Pasadena, Texas. Some of the Defendant's orders for topical creams were filled by Lakeforest Pharmacy, located in Wentzville, Missouri.

Defendant's Receipt of Illegal Kickbacks for Orders

45. It was part of the conspiracy that from 2017 to 2019, the Defendant received illegal kickbacks for signing, authorizing, and ordering Health Care Services, when she had not assessed the patients and had not determined the medical necessity for the Health Care Services, and knew that patients did not need and want the Health Care Services. The companies, from whom the Defendant received illegal kickbacks, typically paid her $30 for each order. The payments to the Defendant by each company are reflected in the chart below:

| Company | Amount Paid | Dates |
|---|---|---|
| Locum Tenens/Encore Telemedicine | $289,620 | 7/25/2017 – 2/28/2019 |
| MedSymphony | $1,440 | 4/3/2018 – 6/19/2018 |
| TOTAL | $291,060 | |

### Overt Acts

46. In furtherance of the conspiracy and to affect the objects of the conspiracy, the overt acts listed below and those identified above, among others, were committed in the Eastern District of Missouri:

47. On or about August 6, 2018, Integrity Medical Supply submitted a reimbursement claim for orthotics ordered by the Defendant for patient D.H.

48. On or about December 12, 2018, MC Medical Supply submitted a reimbursement claim for orthotics ordered by the Defendant for patient S.M.

All in violation of Title 18, United States Code, Section 371.

### Counts 2-11
### Health Care Fraud Scheme
### 18 U.S.C. § 1347(a)(I) and 18 U.S.C. § 2

49. Paragraphs 1-16 and 20-45 are incorporated by reference as if fully set out herein.

50.     As a medical doctor and a Medicare provider since 2006, the Defendant knew that Medicare and Medicaid and other federal health care benefit programs would only reimburse for services that a physician or qualified health care professional had determined to be medically necessary. The Defendant also knew that Medicare and Medicaid would not pay providers for items or services obtained as a result of illegal kickbacks.

51.     It was part of the scheme and artifice to defraud that the Defendant knowingly and willfully solicited and received illegal kickbacks in exchange for orders she signed for medically unnecessary services, including orthotics, to be paid in whole or part by Medicare or Medicaid. It was further part of the conspiracy that co-conspirators Brandy McKay, Jamie McCoy, and Jackson Siples paid R.F., the owner of R&L Marketing, illegal kickbacks for orthotic orders that R&L Marketing referred or sent to Integrity Medical Supply and MC Medical Supply.

52.     It was further part of the scheme and artifice to defraud that the Defendant and her co-conspirators submitted and caused to be submitted reimbursement claims to Medicare and Medicaid for medically unnecessary services which were obtained as a result of illegal kickbacks.

53.     On or about the dates listed below, in the Eastern District of Missouri,

**AMY E. SWEGAN, M.D.**,

the Defendant herein, knowingly and willfully executed, and attempted to execute, the above described scheme or artifice to defraud Medicare and Missouri Medicaid, which are health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the Defendant caused Integrity Medical Supply, MC Medical Supply, and Lakeforest Pharmacy to submit false and fraudulent reimbursement claims for medically

unnecessary items and services, in that the Defendant had not only not examined the patients identified below, but had never met or communicated with the patients and the items and services ordered by the Defendant had been obtained by illegal kickbacks.

| Count | Patient | Date of Service | Date of Claim | Braces or Creams Ordered | Amount Paid | Paid to |
|---|---|---|---|---|---|---|
| 2 | D.N. | 08-06-18 | 08-14-18 | 1 back<br>2 knee | $2,351.00 | Integrity Medical Supply |
| 3 | A.Y. | 11-01-18 | 11-09-18 | 2 ankle<br>2 knee<br>2 suspension sleeves | $1,854.00 | Integrity Medical Supply |
| 4 | D.B. | 12-04-18 | 12-13-18 | 1 back<br>2 knees<br>2 suspension sleeves | $1,551.00 | Integrity Medical Supply |
| 5 | J.C. | 12-27-18 | 12-31-18 | 1 back<br>1 shoulder<br>2 ankle | $2,251.00 | MC Medical Supply |
| 6 | D.C. | 12-20-18 | 01-07-19 | 1 shoulder<br>2 knee<br>1 wrist<br>2 suspension sleeves | $2,378.00 | Integrity Medical Supply |
| 7 | B.C. | 01-04-19 | 01-18-19 | 1 back<br>1 shoulder<br>2 knees<br>2 suspension sleeves | $2,064.00 | Integrity Medical Supply |
| 8 | E.A. | 01-21-19 | 02-04-19 | 1 back<br>1 shoulder<br>2 knees<br>2 suspension sleeves | $2,135.00 | Integrity Medical Supply |
| 9 | D.E. | 01-22-19 | 02-05-19 | 1 back<br>1 shoulder<br>2 ankle | $2,052.00 | Integrity Medical Supply |
| 10 | A.M. | 07-17-18 | 07-17-18 | Doxepin HCL | $2,709.00 | Lakeforest Pharmacy |
| 11 | B.B. | 05-08-18 | 05-18-18 | Fluocinonide | $1,358.00 | Lakeforest Pharmacy |

All in violation of Title 18, United States Code, Sections 1347(a)(l) and 2.

### Counts 12-16
### Illegal Kickbacks for Referrals
### 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 2

54. Paragraphs 1-16, 20-45, and 50-52 are incorporated by reference as if fully set out herein.

55. On or about the dates indicated below, in the Eastern District of Missouri,

**AMY E. SWEGAN, M.D.,**

the defendant herein, and co-conspirators Jason Siples, Brandy McKay, and Jamie McCoy knowingly and willfully caused to be offered and paid remuneration, (including a kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to induce R&L Marketing to refer individuals for the furnishing and arranging for the furnishing of items and services, for which payment may be made in whole or in part under a federal program, that is, Integrity Medical Supply paid R&L Marketing for orders for orthotic braces that R&L Marketing sent or caused to be sent to Integrity Medical Supply.

| Count | Date of Kickback Payment | Amount of Kickback Payment | Paid to | Payor |
|---|---|---|---|---|
| 12 | 09/06/2018 | $170,000 | R&L Marketing | Integrity Medical |
| 13 | 09/28/2018 | $225,000 | R&L Marketing | Integrity Medical |
| 14 | 10/26/2018 | $194,000 | R&L Marketing | Integrity Medical |
| 15 | 11/08/2018 | $170,000 | R&L Marketing | Integrity Medical |
| 16 | 11/16/2018 | $110,000 | R&L Marketing | Integrity Medical |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 42, United States Code, Section 1320a-7b or Title 18, United States Code, Section 1347, including conspiracy to commit such offenses, as set forth in Counts 1 through 16, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

2. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney